**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Tamara Jean Parks, Individually and as Trustee for the heirs and next of kin of Perry Michael Parks,

Civil File No. 00-2191 (MJD/SRN)

Plaintiff,

v.

**MEMORANDUM AND ORDER**

Michael Pomeroy, Jeff Gottstein in their individual capacities as officers of the Woodbury Police Department, and the City of Woodbury,

Defendants

---

Robert Bennett and Eric Haggeman, Flynn, Gaskins & Bennett, L.L.P. for and on behalf of Plaintiff.

Pierre N. Regnier and Joseph E. Flynn, Jardine, Logan & O'Brien, P.L.L.P. for and on behalf of Defendant Michael Pomeroy.

---

## I. INTRODUCTION

This matter is before the Court on Defendant Michael Pomeroy's Motion for Summary Judgment.[1] In the underlying Complaint, Plaintiff Tamara Jean Parks alleges violations of the First, Fourth, Fifth and Fourteenth Amendments to the U.S. Constitution pursuant to 42 U.S.C. § 1983. Plaintiff bases these

[1] Plaintiff's claims against Defendants Jeff Gottstein and the City of Woodbury were dismissed with prejudice by Stipulation and Order for Dismissal dated September 17, 2001.

FILED 3-17-03
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD ________
DEPUTY CLERK ________

allegations on the shooting of decedent, Perry Michael Parks, by Defendant. For the reasons that follow, this Court denies Defendant's motion.

## II. BACKGROUND

What started as a fairly typical evening out for Tamara Parks ("Mrs. Parks" or "Plaintiff") and Perry Parks ("Mr. Parks" or "decedent"), ended with Mr. Parks being shot by Officer Michael Pomeroy ("Officer Pomeroy") – the tragic conclusion to a struggle between Mr. Parks and Officers Pomeroy and Jeffrey Gottstein ("Officer Gottstein").

Around 5:30 p.m., on Saturday, June 3, 2000, the Parks went to Sunsets of Woodbury ("Sunsets"), a restaurant and bar located about a mile from the Parks' residence. While at Sunsets, Mrs. Parks saw Mr. Parks drink at least three 22-ounce mugs of beer. Just prior to leaving the bar, the couple had a disagreement regarding whether their teenage daughter should go out that evening. Mrs. Parks ended the conversation quickly because she did not like the tone in Mr. Parks' voice, and gave Mr. Parks the "silent treatment." Although Mr. Parks drove to the bar, Mrs. Parks drove home because the alcohol he consumed had affected Mr. Parks.

The couple arrived home at approximately 9:30 p.m. Shortly after arriving home, Mr. Parks started yelling and swearing at Mrs. Parks. Although it is not entirely clear from Mrs. Parks' deposition testimony what Mr. Parks was yelling about, it is reasonable to infer that it related to the earlier disagreement at Sunsets and Mrs. Parks' subsequent "silent treatment." Mrs. Parks made the decision to

leave and go to either a friend's house or to her sister-in-law's house because she didn't want to argue with Mr. Parks. While she was digging in her purse for her keys, Mr. Parks made a comment to their daughter Stacy that Mrs. Parks was going over to a friend's house. Mrs. Parks then said, "Yes. I'm going to a friend's house, Stacy. Why don't you go up to bed?"

It was at this point that Mr. Parks started yelling at Mrs. Parks, saying that Stacy did not have to go up to bed, and repeating several times to Mrs. Parks, "Fuck you. You're a bitch. I'm sick of this."

Stacy started crying and told Mr. Parks to shut up and be quiet. At one point, Mr. Parks stepped towards Mrs. Parks and slammed his hand on the kitchen counter. Mrs. Parks responded by grabbing the telephone. She told Mr. Parks that if he did not calm down she would call and have him removed. Although Mrs. Parks does not remember the exact words, Mr. Parks responded with something to the effect of "go ahead."

Mrs. Parks subsequently called 911. The relevant portions of the conversation between Mrs. Parks and the 911 dispatcher are as follows:

WD[2]: 911 Emergency.
TP[3]: Can you send someone to 2704 Horseshoe Lane.
WD: What's happening?
TP: It's a big mess here. Uh, my husband's drunk, and he's getting very violent.
WD: Okay, is it physical?
TP: What?
WD: Is it physical?

---

[2] Woodbury dispatcher.
[3] Mrs. Parks.

TP: N-not – well, not yet. But it's gonna [sic] get there. My girls are here.

* * *

WD: I would like to keep you on the phone, okay?
TP: Yeah.
WD: Is your name Tami?
TP: Yeah, it's Tami.
WD: Okay.
TP: Come get him out of here.
WD: Yep, we are.

* * *

TP: He's downstairs.
WD: All right. And this occurred – occurred before?
TP: Well, this is the first time I've seen him this bad.
WD: Okay.

While Mrs. Parks was on the phone with the 911 dispatcher, a call went out to Woodbury police officers to respond to the domestic dispute call. Officer Gottstein was the first to respond. The 911 dispatcher informed him of the address and some basic details: "Husband/wife. Male is [drunk]. No weapons. It's not physical at this point, but it sounds like it might get there." The dispatcher then asked for another squad to assist Officer Gottstein. Officer Pomeroy indicated that he was responding. The dispatcher subsequently broadcast more information: "It's a husband/wife domestic . . . the father is [drunk] . . . [a]pparently it's husband versus wife. The husband is [drunk]. Children are involved."

Officers Gottstein and Pomeroy arrived at the Parks' residence at approximately 9:51 p.m. Officer Pomeroy informed the dispatcher that both of the officers were on the scene. Officers Gottstein and Pomeroy entered the residence and encountered Mr. Parks in the kitchen. The kitchen was well lit at the time.

Mr. Parks was standing near the kitchen sink in the corner of the kitchen. At this point, Mrs. Parks was standing near the stairs looking into the kitchen.

One of the officers, possibly Officer Gottstein, asked Mr. Parks what was going on and Mr. Parks responded with a shrug. Officer Gottstein then told Mr. Parks, "We're going to get you out of here."

Mr. Parks responded, "No. This is my house. I didn't do anything."

At that point Officer Gottstein stepped forward and grabbed him by the arm. Mr. Parks put up his arms to stop Officer Gottstein, and Officer Gottstein lost his balance and took a step back. Officer Gottstein then came forward and grabbed Mr. Parks by the throat. A scuffle ensued, with Officer Gottstein using his OC spray[4]. Mr. Parks and Officer Gottstein ended up going to the floor, with Mr. Parks having Officer Gottstein in a headlock. Mr. Parks was on top of Officer Gottstein facing the opposite direction.

Officer Gottstein testified that while on the floor he felt his belt and firearm being moved. Officer Gottstein wore his firearm on his right side. Mr. Parks' left hand was closest to Officer Gottstein's firearm. Officer Gottstein believed that Mr. Parks had his hand on his firearm. Officer Gottstein yelled, "I think he's going for my gun."

While Officer Gottstein and Mr. Parks were struggling on the floor, Officer Pomeroy attempted to engage Mr. Parks. Officer Pomeroy testified at his

---

[4] "OC" is an abbreviation for "oleoresin capsicum." OC spray is also known as "pepper spray."

deposition that he was trying to get Mr. Parks off of Officer Gottstein. Officer Pomeroy testified that, despite the presence of the OC spray, he could clearly see. When Officer Gottstein yelled that Mr. Parks was trying to get his gun, Officer Pomeroy drew his firearm and placed it in Mr. Parks' right shoulder. Officer Pomeroy testified that at that point he could not see if Mr. Parks was attempting to remove Officer Gottstein's firearm, but instead was relying on Officer Gottstein's statement. Pomeroy testified that he began yelling, "let go of the gun, let go of the gun."

When Mrs. Parks saw Officer Pomeroy draw his firearm she screamed, "Perry. Perry," and ran up behind Mr. Parks. Mrs. Parks told Officer Pomeroy not to shoot and attempted to pull Mr. Parks apart from Officer Gottstein. Mrs. Parks testified that, despite the presence of the OC spray, she could see. She asserts that she looked down and could see that Mr. Parks' left hand was on the floor bracing him, and not on Officer Gottstein's firearm. She also asserts that Officer Pomeroy told Mr. Parks, "Don't go for the gun, " to which Mr. Parks responded, "I'm not. I can't see."

Officer Pomeroy testified that he looked down and was able to see Officer Gottstein's hand on the grip of the firearm as well as Mr. Parks' hand also on the grip. Mr. Parks' hand was covering part of Officer Gottstein's hand. Officer Pomeroy also testified that he could see the firearm partially withdrawn from the holster. Officer Pomeroy attempted to shoot Mr. Parks, but his firearm only clicked and did not discharge a round. He then attempted a malfunction drill,

which consisted of banging the bottom of the ammunition magazine with his hand. Officer Pomeroy asserts that he gave Mr. Parks more commands to let go of the gun or he would shoot him. An attempt to shoot Mr. Parks was made again, but again the firearm misfired. Officer Pomeroy stood up, tapped the magazine again and racked the slide of his firearm. A round ejected from the firearm. At some point during the struggle, Mrs. Parks backed off, asserting that Officer Pomeroy brought his gun up with the barrel pointed at her face.

Officer Pomeroy again placed the gun into Mr. Parks' body. Mr. Parks was at this time looking up at Officer Pomeroy. Officer Pomeroy asserts that throughout the struggle he repeatedly told Mr. Parks to "let go of the gun" or "don't go for the gun." Officer Pomeroy pulled the trigger a third time, successfully discharging a round into Mr. Parks. Officer Pomeroy testified that at the time he pulled the trigger he could still see Mr. Parks' hand and that it was still on Officer Gottstein's firearm. To the contrary, Mrs. Parks testified that she saw Mr. Parks' hand on the floor at the time he was shot. Mr. Parks died a short time later as a result of the gunshot wound. Only three or four minutes elapsed from the time the officers entered the residence until Officer Pomeroy shot Mr. Parks.

## III. DISCUSSION

### A. Legal Standard

Summary judgment is appropriate if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Unigroup, Inc. v.

O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219-20 (8th Cir. 1992). The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. See Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik, 47 F.3d at 957. The Court must view the evidence, and the inferences that may be reasonably drawn from the evidence, in the light most favorable to the nonmoving party. See Enter. Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996).

**B. Plaintiff's Claims**

Section 1983 guarantees legal or equitable remedies to an individual who is deprived "of any rights, privileges, or immunities secured by the Constitution and laws" of the United States by any person acting under the color of state law. See 42 U.S.C. § 1983; Gomez v. Toledo, 446 U.S. 635, 638 (1980); Omni Behavioral Health v. Miller, 285 F.3d 646, 650-51 (8th Cir. 2002). In order to state a claim under section 1983, a plaintiff must allege: 1) deprivation of a federal right by some person; and 2) that the person acted under the color of state law. See Gomez, 446 U.S. at 640; Armstrong v. Fairmont Cmty. Hosp. Ass'n, Inc., 684 F.Supp. 1486, 1488 (D.Minn. 1987).

Plaintiff alleges that Officer Pomeroy, acting under the color of state law, violated decedent's constitutional rights when he shot Parks during the struggle

with Officer Gottstein and Officer Pomeroy. An individual may recover damages from a state or local official who commits a constitutional tort. See Jones v. United States, 16 F.3d 979, 980 (8th Cir. 1994). The excessive use of force by a police officer against an arrestee is such a tort. See Johnson v. Jones, 515 U.S. 304, 307 (1995). Plaintiff has thus stated a cognizable section 1983 claim.

### C. Officer Pomeroy's Motion

Officer Pomeroy asks the court to dismiss Plaintiff's claims against him as a matter of law, identifying two grounds for dismissal: 1) that the facts cannot establish a constitutional violation; and 2) that, even if the facts can establish a constitutional violation, he is entitled to qualified immunity. See Saucier v. Katz, 533 U.S. 194, 201 (2001). Qualified immunity protects state and local police officers from liability when their conduct does not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Officer Pomeroy also asks the Court to dismiss Plaintiff's punitive damages claim.

#### 1. Constitutional Violation

Plaintiff alleges violations of the First, Fourth, Fifth and Fourteenth Amendments. The gravamen of her complaint, however, is that Officer Pomeroy used excessive force and unreasonably seized Mr. Parks by shooting him.[5] "All claims that law enforcement officials used excessive force . . . in the course of

[5] The Court recognizes that it is an unavoidable understatement to characterize the shooting as a "seizure," but it is under that rubric that Plaintiff's claims must be analyzed. See Gardner v. Buerger, 82 F.3d 248, 251 (8th Cir. 1996).

making an arrest or other 'seizure' of a free citizen are properly analyzed under the Fourth Amendment." Cole v. Bone, 993 F.2d 1328, 1332 (8th Cir. 1993) (citing Graham v. Connor, 490 U.S. 386, 394-95 (1989)).

The Court is thus tasked with determining whether Officer Pomeroy's seizure of Mr. Parks comprised a constitutional violation if the record is construed in a light most favorable to Plaintiff. Such a determination involves an inquiry into whether Officer Pomeroy's seizure of Mr. Parks was objectively reasonable under the Fourth Amendment. See Graham, 490 U.S. at 395-96. The reasonableness inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [wa]s actively resisting arrest or attempting to evade arrest by flight." Id. at 396. The reasonableness of the force used "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id.

The Court must balance "the nature and quality of the intrusion on Fourth Amendment interests against the countervailing government interests." Id. In balancing the nature and quality of the intrusion with countervailing government interests, it is important to keep in mind "'the intrusiveness of a seizure by means of deadly force is unmatched.'" Tauke v. Stine, 120 F.3d 1363, 1366 (8th Cir. 1997) (quoting Tennessee v. Garner, 471 U.S. 1, 9 (1985)). Graham clearly establishes the general proposition that the use of force is actionable under the

Fourth Amendment if it is excessive under objective standards of reasonableness. See Saucier v. Katz, 533 U.S. 194, 201-02 (2001). Deadly force is reasonable under the Fourth Amendment when there is probable cause of immediate threat of death or serious bodily injury. See Garner, 471 U.S. 1 at 11.

The 911 dispatcher informed the officers responding to Mrs. Parks' 911 call that there was a domestic disturbance involving a husband and wife, and that children were involved. The dispatcher also informed them that it was not physical at that point, but it might get there and that the husband was drunk. Upon arriving at the residence they encountered Mr. Parks in the kitchen and attempted to get him to come with them. Mr. Parks refused, stating that he was in his house and that he had not done anything.

The officers attempted to place him under physical control, however, neither officer told Mr. Parks that he was under arrest or suspected of any crime before attempting to physically subdue him. Mr. Parks resisted the officers and a struggle ensued in which he ended up on top of Officer Gottstein. Officer Gottstein believed that Mr. Parks was attempting to grab his firearm and vocalized his fear. Officer Pomeroy ordered Mr. Parks to not attempt to grab Officer Gottstein's firearm and drew his own firearm, thereafter shooting Mr. Parks. The entire incident took place in a well lit room, and Officer Pomeroy asserts that he was able to see Mr. Parks' hands throughout the struggle.

The reasonableness of Officer Pomeroy's beliefs and actions are dependent upon Mr. Parks' actions during the struggle with Officer Gottstein and Officer

Pomeroy. See e.g., Wilson v. City of Des Moines, 293 F.3d 447, 451 (8th Cir. 2002); see also McCaslin v. Wilkins, 183 F.3d 775, 779 (8th Cir. 1999). Officer Pomeroy asserts that he could see Mr. Parks' hand and that throughout the struggle Mr. Parks continued to try and access Officer Gottstein's firearm. Mrs. Parks, however, tells a different tale. She testified that she could see Mr. Parks' left hand on the floor at the time he was shot. Additionally, she asserts that, in response to Officer Pomeroy's command to not go for the gun, Mr. Parks said, "I'm not. I can't see."

The differing testimony of Mrs. Parks and Officer Pomeroy gives rise to a factual dispute about what Mr. Parks' was doing just prior to and at the time he was shot. See McCaslin, 183 F.3d at 779. This factual dispute goes to the heart of the matter. Viewing the record in a light most favorable to Plaintiff, a reasonable jury could find that Officer Pomeroy shot Mr. Parks despite the fact that he could see that Mr. Parks' hand was not on Officer Gottstein's firearm, and that therefore Mr. Parks did not pose an immediate threat to the safety of the officers or others. A reasonable jury could find such a shooting unreasonable. Viewing the record in a light most favorable to Plaintiff, she has made out a constitutional violation.

Officer Pomeroy makes much of Officer Gottstein's belief that, throughout the struggle, Parks was attempting to acquire his firearm. This Court has no reason to doubt that Officer Gottstein believed that Parks was attempting to acquire his firearm, as Officer Gottstein could not see what was going on. Officer Pomeroy asserts that he believed that his partner was telling him what was

happening, and therefore his actions were reasonable under the circumstances. Cf. Liu v. Phillips, 234 F.3d 55, 57-58 (1st Cir. 2000) (stating that officer entitled to qualified immunity where reasonable reliance on information from fellow officer); State v. Conaway, 319 N.W.2d 35, 40 (Minn. 1982) (stating that arresting officer entitled to rely on collective information). This argument misses the point. Officer Pomeroy asserts that he saw Parks' hand on Officer Gottstein's firearm. Officer Pomeroy's testimony leads to the inescapable conclusion that he was in a position to see what Officer Gottstein couldn't – whether Parks' was in fact attempting to acquire Officer Gottstein's firearm. Officer Pomeroy cannot rely on Officer Gottstein's belief to support his actions when he was in a better position to assess the situation.

To determine conclusively that Officer Pomeroy acted in an objectively reasonable manner would involve a judgment by this Court as to the veracity of the witnesses' accounts. At this juncture, the Court is prohibited from weighing the evidence and making credibility determinations. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (U.S. 2000). On the record before the Court, a reasonable jury could find that Officer Pomeroy's actions were not objectively reasonable under the facts and circumstances to which he was presented. Plaintiff has identified specific factual disputes that a jury must resolve.

**2. Clearly Established Right**

In order to survive summary judgment on the second Saucier prong, a plaintiff must show that "the law . . . clearly put the officer on notice that his actions [we]re unreasonable." Wilson, 293 F.3d at 450. However, summary judgment is appropriate even if the officer reasonably, but wrongly, believed that the actions taken were reasonable under the circumstances. Saucier, 533 U.S. at 206.

This Court is required to determine whether Officer Pomeroy was clearly on notice that a use of deadly force on an individual, without probable cause to believe that individual posed an immediate threat to officers or others, would violate the Fourth Amendment. Deadly force is reasonable under the Fourth Amendment when there is probable cause of immediate threat of death or serious bodily injury. See Garner, 471 U.S. at 11; Nelson v. County of Wright, 162 F.3d 986, 990 (8th Cir. 1998). Stated in the negative, use of force is unreasonable under the Fourth Amendment if it "'is excessive under objective standards of reasonableness.'" Wilson, 293 F.3d at 450 (quoting Saucier, 533 U.S. at 201-02).

As explained above, a reasonable jury could conclude that Officer Pomeroy shot Mr. Parks despite the fact that he did not pose an immediate threat to the officers or to others. A reasonable police officer would have clearly been on notice in June of 2000 that no greater force should be used in making an arrest than was reasonable under the circumstances, and that deadly force would be unreasonable unless there was probable cause to believe that officers or others

were faced with an immediate threat of serious physical harm. See Nelson, 162 F.3d at 986.

### C. Punitive Damages

The purpose of an award of punitive damages is to punish an individual for outrageous conduct and to deter the individual and others like him from similar conduct in the future. See Smith v. Wade, 461 U.S. 30, 46 (1988); Restatement (Second) of Torts § 908(1). "Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." Restatement (Second) of Torts § 908(2).

This court must determine whether the facts in the record, interpreted in a light most favorable to Plaintiff, show that Officer Pomeroy acted with evil motive or intent, or with reckless or callous indifference to the federally protected rights of others. See, Smith, 461 U.S. at 56; Cornell v. Woods, 69 F.3d 1383, 1391 (8th Cir. 1995). Whether Officer Pomeroy's conduct was sufficiently callous so as to justify punitive damages is a question of ultimate fact. See Coleman v. Rahija, 114 F.3d 778, 787 (8th Cir. 1997).

The district court for the Eastern District of Pennsylvania recently addressed the correlation between a denial of summary judgment as to qualified immunity and a denial of summary judgment as to punitive damages. See Russoli v. Salisbury Township, (E.D.Pa. 2000). The court concluded that:

> [t]he objective standard of 'callous or reckless indifference' that suffices for an award of punitive damages is not far removed from the standard for denying qualified immunity to the officers--whether

> a reasonable officer would have known that his conduct violated a clearly established constitutional right. Therefore any claim that will be tried and for which the jury finds facts that would result in our denying qualified immunity could also be the basis for punitive damages. Whether or not punitive damages are appropriate will depend on the jury's findings as to the circumstances of the Officers' actions and their states of mind.

Id.; accord Davis v. Hill, 173 F.Supp.2d 1136, 1147 (D.Kansas 2001); but see Lavicky v. Burnett, 758 F.2d 468, 477 (10th Cir. 1986) (stating that even arrogant ignorance of applicable legal rules does not by itself indicate callous or reckless indifference).

This Court agrees with the reasoning in Russoli, and concludes that the same factual issues precluding summary judgment on Officer Pomeroy's qualified immunity defense preclude summary judgment on his request for summary judgment on Plaintiff's punitive damages claim. The Court notes that this does not necessarily mean that Plaintiff is entitled to punitive damages. Indeed, while reasonable jurors could alternatively conclude that Officer Pomeroy acted with reckless or callous indifference to Mr. Parks' Fourth Amendment rights, they could conclude that Officer Pomeroy was in fact acting objectively reasonably. See, e.g., Habiger v. City of Fargo, 905 F.Supp. 709, 724 (D.N.D. 1995) (noting that jury could find officers' conduct justified, negligent, reckless or grossly negligent or willful).

## IV. CONCLUSION

Plaintiff has identified specific evidence in the record which would allow a jury to find that Officer Pomeroy's conduct was not objectively reasonable and

violated decedent's clearly established Fourth Amendment rights. The same specific evidence would also allow a reasonable jury to find that Officer Pomeroy acted with reckless and callous indifference with respect to decedents' Fourth Amendment rights.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion for Summary Judgment is **DENIED**.

Dated: March 14, 2003

Michael J. Davis
United States District Court Judge