# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

No. 03-2043
00-2191 MJD/SRN

| | | |
|---|---|---|
| Tamara Jean Parks, individually and as Trustee for the heirs and next of kin of Perry Michael Parks, | * | |
| Appellee, | * | |
| v. | * | |
| Michael Pomeroy, in his individual capacity as an officer of the Woodbury Police Department, | * | Appeal from the United States District Court for the District of Minnesota |
| Appellant. | * | |
| Jeff Gottstein, in his individual capacity as an officer of the Woodbury Police Department; City of Woodbury, | * | |
| Defendants. | * | |

Submitted: February 13, 2004
Filed: November 5, 2004

Before MELLOY, McMILLIAN and COLLOTON, Circuit Judges.

McMILLIAN, Circuit Judge.

Tamara Jean Parks ("plaintiff") brought this § 1983 civil rights action in the United States District Court for the District of Minnesota on behalf of herself and the

SCANNED
DEC 2 9 2004
U.S. DISTRICT COURT MPLS

heirs and next of kin of her deceased husband, Perry Michael Parks ("Parks") against the City of Woodbury, Minnesota, and Woodbury police officers Michael Pomeroy and Jeff Gottstein. In her complaint, plaintiff asserted a Fourth Amendment claim, among others, alleging that Pomeroy had used objectively unreasonable force when he fatally shot Parks during a struggle between Gottstein and Parks in Parks's house after Pomeroy and Gottstein responded to plaintiff's 911 call reporting a domestic dispute. Now before this court is an interlocutory appeal from an order of the district court denying Pomeroy's motion for summary judgment based upon qualified immunity. Parks v. Pomeroy, No. 00-2191 (D. Minn. Mar. 14, 2003) (memorandum and order) (hereinafter "slip op."). For reversal, Pomeroy argues that the district court erred in failing to hold that (1) in view of certain undisputed material facts, plaintiff cannot establish a constitutional violation as a matter of law, or (2) even if plaintiff can establish a constitutional violation, he is entitled to qualified immunity. For the reasons stated below, we reverse the district court's denial of qualified immunity and remand the case to the district court for further proceedings consistent with this opinion.

The district court had original jurisdiction based upon 28 U.S.C. §§ 1331, 1343. We have appellate jurisdiction under the collateral order doctrine. See Johnson v. Jones, 515 U.S. 304, 310-12 (1995) (citing, e.g., Mitchell v. Forsyth, 472 U.S. 511 (1985); Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541 (1949)).

The following summary of the facts is based upon plaintiff's allegations, viewed in the light most favorable to plaintiff. See Appellant's Appendix, Vol. I, at 56-129 (Deposition of Tamara Jean Parks). On the evening of Saturday, June 3, 2000, plaintiff and Parks went to a restaurant and bar called "Sunsets of Woodbury" ("Sunsets"), located near their home. While at Sunsets, plaintiff had less than two beers, and Parks drank approximately three 22-ounce mugs of beer. Shortly after 9:00 p.m., while plaintiff and Parks were preparing to leave Sunsets, their 17-year-old daughter called them on their cellular phone. After the phone call, plaintiff and Parks

had a disagreement, and plaintiff began giving Parks the "silent treatment." Plaintiff went to retrieve their car and, with plaintiff driving, they returned home at approximately 9:30 p.m. Shortly after they arrived home, Parks began yelling and swearing at plaintiff. Their 12-year-old daughter began crying and told Parks to stop. Parks continued yelling and slammed his hand on the kitchen counter. Plaintiff grabbed the telephone and told him that she would call the police if he did not calm down. He responded by saying something to the effect of "go ahead." She called 911. Her conversation with the 911 dispatcher included the following pertinent remarks:

| | |
|---|---|
| Dispatcher: | 911 Emergency. |
| Plaintiff: | Can you send someone to 2704 Horseshoe Lane. |
| Dispatcher: | What's happening? |
| Plaintiff: | It's a big mess here. Uh, my husband's drunk, and he's getting very violent. |
| Dispatcher: | Okay, is it physical? |
| Plaintiff: | What? |
| Dispatcher: | Is it physical? |
| Plaintiff: | N-not- well, not yet. But it's gonna get there. My girls are here. |
| . . . . | |
| Plaintiff: | Come get him out of here. |
| Dispatcher: | Yep, we are. |
| . . . . | |
| Dispatcher: | All right. And this occurred – occurred before? |
| Plaintiff: | Well, this is the first time I've seen him this bad. |

The dispatcher instructed plaintiff to remain on the line until help arrived. Meanwhile, a call went out for officers to respond. Gottstein was the first to respond by radio. The 911 dispatcher gave him the address and the following information:

"Husband/wife. Male is [drunk]. No weapons. It's not physical at this point, but it sounds like it might get there." Pomeroy also responded to the dispatcher by radio, and he received the same information. Both Gottstein and Pomeroy proceeded to the house. The dispatcher reiterated the following information to the officers: "It's a husband/wife domestic . . . the father is [drunk] . . . [a]pparently it's husband versus wife. The husband is [drunk]. Children are involved."

Gottstein and Pomeroy arrived at the house at roughly the same time, and they entered the house together. Plaintiff told them that Parks was in the kitchen. When the officers went into the kitchen, Parks had calmed down and was standing by the sink loading the dishwasher and eating a snack.[1] Gottstein said to Pomeroy: "We're going to get you out of here." Parks responded: "No. This is my house. I didn't do anything." Gottstein lunged forward and attempted to grab Parks. Gottstein is 5'5" and weighs approximately 170 pounds. Parks was 5'11" and weighed approximately 220 pounds. As Gottstein lunged forward, Parks raised one hand and blocked Gottstein, causing Gottstein to stumbled backward. Gottstein regained his balance, grabbed Parks by the throat, and sprayed Parks several times in the face with Oleoresin Capsicum or "OC" spray (similar to mace). Parks began waving his hands in front of his face, while resisting Gottstein's efforts to gain control of him. The two ended up in a physical struggle on the kitchen floor, facing in opposite directions with Parks on top of Gottstein. Pomeroy remained close by, but at this point had not engaged in the physical struggle between Parks and Gottstein. While Gottstein and Parks were struggling on the floor, Gottstein yelled out: "I think he's going for my gun."[2] At that point, Pomeroy drew his firearm and pointed it directly into the back

---

[1]According to Pomeroy, there were two steak knives laying on the kitchen counter close to where Parks was standing. At some point, Gottstein grabbed the knives and threw them into a nearby hallway. However, there remained on the counter a knife block containing several knives. See Brief for Appellant at 7.

[2]According to Pomeroy, when Gottstein yelled that he thought Parks was going for his gun, Pomeroy looked over and observed Gottstein's hand on the grip of his

of Parks's right shoulder. Plaintiff, upon seeing Pomeroy draw his gun, screamed and ran over to Parks, who was on his hands and knees, on top of Gottstein. Plaintiff tried to pull Parks up by the shoulders and told Pomeroy not to shoot. She could feel the effects of the OC spray in her throat, but her eyes were not affected by it. She heard Pomeroy's gun click, but it did not discharge. Pomeroy told Parks not to go for the gun, to which Parks replied: "I'm not. I can't see." Plaintiff was on Parks's left side and could see that Parks's left hand (the one closest to Gottstein's gun) was on the floor bracing himself and not touching Gottstein's gun. She observed Pomeroy reach in between Parks and Gottstein with one hand and bring his gun upward with his other hand. Pomeroy's gun came to a location where it was pointed directly at plaintiff, causing her to scream and back away. As she was backing away, she observed Pomeroy fire his gun directly into the back of Parks's right shoulder.[3] Parks died moments later. At the moment Pomeroy shot Parks, Parks was still on his hands and knees. The total amount of time that elapsed between the officers' arrival at the house and the shooting of Parks was approximately three to four minutes.

The district court held that the facts presented at the summary judgment stage, when viewed in the light most favorable to plaintiff, could reasonably support the conclusion that Pomeroy violated Parks's Fourth Amendment rights when he fatally shot Parks. The district court reasoned:

> Viewing the record in the light most favorable to Plaintiff, a reasonable jury could find that Officer Pomeroy shot Mr. Parks despite

---

own gun and Parks's hand partially on the grip of Gottstein's gun and partially covering Gottstein's hand. The gun, moreover, was partially withdrawn from the holster. Brief for Appellant at 11.

[3]According to Pomeroy, he twice previously attempted to shoot Parks but his gun did not discharge. Each time it malfunctioned, Pomeroy performed a so-called "malfunction drill" in which he banged the bottom of the gun magazine with his hand. The gun discharged on his third attempt to shoot Parks. Id. at 13.

> the fact that he could see that Mr. Parks' hand was not on Officer Gottstein's firearm, and that therefore Mr. Parks did not pose an immediate threat to the safety of the officers or others.

Slip op. at 12. The district court also specifically rejected Pomeroy's argument that he reasonably relied upon Gottstein's statement: "I think he's going for my gun." The district court explained:

> This argument misses the point. Officer Pomeroy asserts that he saw Parks' hand on Officer Gottstein's firearm. Officer Pomeroy's testimony leads to the inescapable conclusion that he was in a position to see what Officer Gottstein couldn't – whether Parks was in fact attempting to acquire Officer Gottstein's firearm. Officer Pomeroy cannot rely on Officer Gottstein's belief to support his actions when he was in a better position to assess the situation.

Id. at 13. Thus, the district court concluded that Pomeroy was not entitled to judgment as a matter of law on the merits of plaintiff's Fourth Amendment claim.

On the separate question of whether Pomeroy was nevertheless entitled to qualified immunity because plaintiff could not establish a violation of a "clearly established" right, the district court reasoned that, at the time of the events in question, a reasonable police officer would have been clearly on notice that no greater force may be used in making an arrest than is reasonable under the circumstances and, more specifically, that deadly force is unreasonable unless there is "probable cause to believe that officers or others [are] faced with an immediate threat of serious physical harm." Id. at 14-15 (citing Nelson v. County of Wright, 162 F.3d 986 (8th Cir. 1998)). The district court noted: "As explained above, a reasonable jury could conclude that Officer Pomeroy shot [Parks] despite the fact that [Parks] did not pose an immediate threat to the officers or to others." Id. at 14. The district court concluded: "Plaintiff has identified specific evidence in the record which would allow a jury to find that Officer Pomeroy's conduct was not objectively reasonable and

violated [Parks]'s clearly established Fourth Amendment rights." Id. at 16-17. The district court thus held that Pomeroy was not entitled to qualified immunity on summary judgment. This appeal followed.

As a threshold matter, we note that, prior to the submission of the parties' briefs on appeal, plaintiff filed a motion to dismiss Pomeroy's interlocutory appeal for lack of appellate jurisdiction. We summarily denied the motion and ordered the briefing to proceed. See Parks v. Pomeroy, No. 03-2043 (8th Cir. May 27, 2003) (order). As indicated above, our jurisdiction over Pomeroy's interlocutory appeal is proper under the collateral order doctrine, although it is limited. To begin, we must assume the truth of plaintiff's allegations, viewing those allegations in the light most favorable to her claim of injury. See Saucier v. Katz, 533 U.S. 194, 201 (2001). We may not assume any fact asserted by Pomeroy which the district court has deemed to be genuinely disputed, nor may we question at this point whether the dispute is truly genuine. Johnson v. Jones, 515 U.S. at 313-19; see also Moore v. Duffy, 255 F.3d 543 (8th Cir. 2001) (dismissing appeal for lack of interlocutory appellate jurisdiction under Johnson v. Jones). On that basis, we must decide whether the facts viewed in the light most favorable to plaintiff can establish a constitutional violation. Saucier v. Katz, 533 U.S. at 201 ("A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry.").

If the facts alleged, viewed in the light most favorable to plaintiff, cannot establish a constitutional violation, judgment for Pomeroy is required. If, however, a constitutional violation can be established by plaintiff's allegations, we must further decide whether Pomeroy violated a "clearly established" right. Id. at 201-02 ("[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established."). This "clearly established" standard *must* be met in order to permit the denial of qualified immunity.

For these inquiries, we conduct a *de novo* review. See, e.g., Tuggle v. Mangan, 348 F.3d 714, 719-20 (8th Cir. 2003) (standard of review).

In support of the argument that plaintiff cannot establish a constitutional violation as a matter of law, Pomeroy maintains, among other things, that at one point Pomeroy saw Parks's hand on Gottstein's gun while the two were struggling and that "Pomeroy believed that his partner was telling him what was going on." Brief for Appellant at 22. Based upon these and other circumstances such as plaintiff's 911 call and the rapid, dangerous, and uncertain manner in which events unfolded, Pomeroy argues that no constitutional violation can be established as a matter of law. Brief for Appellant at 24-26 (citing, e.g., Graham v. Connor, 490 U.S. 386, 396 (1989) ("Because '[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application,' . . . its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. . . . The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.")).

The district court was well aware of the precedents now cited by Pomeroy. See slip op. at 10-11 (quoting Graham v. Connor, among other cases). The district court nevertheless concluded, based upon the totality of the circumstances, that there was sufficient evidence to support a finding that Pomeroy's shooting of Parks was objectively unreasonable.[4] The district court held:

---

[4]It is true that Pomeroy was forced to make a quick and difficult decision under dangerous and uncertain circumstances. On the other hand, the district court was warranted in assuming the following factual allegations and inferences. When the officers arrived at the house, Parks had calmed down and had not become violent as plaintiff had feared. When Gottstein told Parks he would have to leave, Parks

> The differing testimony of Mrs. Parks and Officer Pomeroy gives rise to a factual dispute about what Mr. Parks was doing just prior to and at the time he was shot. This factual dispute goes to the heart of the matter. Viewing the record in the light most favorable to Plaintiff, a reasonable jury could find that Officer Pomeroy shot Mr. Parks despite the fact that he could see that Mr. Parks' hand was not on Officer Gottstein's firearm, and that therefore Mr. Parks did not pose an immediate threat to the safety of the officers or others. A reasonable jury could find such a shooting unreasonable.

Id. at 12.

We agree with the Seventh Circuit's observation that the initial inquiry under Saucier v. Katz, 533 U.S. at 201, "starts with separating factual and legal components of the claim for relief." Anderson v. Cornejo, 355 F.3d 1021, 1022 (7th Cir. 2004) (reversing denial of qualified immunity on interlocutory appeal upon concluding that the facts alleged by the plaintiffs, when viewed in the light most favorable to them,

---

responded that he did not have to leave his own house when he had done nothing wrong. The officers did not tell Pomeroy that he was under arrest or that he was suspected of any crime. Gottstein (who was considerably smaller than Parks) lunged at Parks, and, at that point, Parks rebuffed him by raising up his hand. Gottstein then grabbed Parks by the throat, sprayed Parks in the face with OC spray, and ended up on the floor underneath the obviously much bigger man. Gottstein was then heard to say, "I think he's going for my gun." From the time Gottstein made that statement until the moment Parks was shot, Parks remained on his hands and knees with his left hand on the floor bracing himself. When Pomeroy instructed Parks not to go for Gottstein's gun, Parks (having just been repeatedly sprayed in the face with OC spray) responded: "I'm not. I can't see." Before he fatally shot Parks, Pomeroy had at least enough time to aim and fire his weapon twice and to perform the "malfunction drill" each time. Finally, at the time Pomeroy fired that third and fatal shot, he could see that Parks's left hand was not on Gottstein's gun.

could not establish the actual elements of their equal protection claim).[5] In the present case, the issue of whether Pomeroy used objectively unreasonable force when he fatally shot Parks is a question of fact. See, e.g., Kuha v. City of Minnetonka, 365 F.3d 590, 597-98 (8th Cir. 2003) (as amended Apr. 27, 2004) ("[T]he relevant inquiry is whether [the plaintiff] presented enough proof in support of his claim that a jury could properly find that the degree of force used against him was not 'objectively reasonable.'").

As indicated above, we lack jurisdiction at the present stage of the litigation to review the district court's conclusions regarding the sufficiency of the evidence to establish material facts. See Johnson v. Jones, 515 U.S. at 313 ("We now consider the appealability of a portion of the district court's summary judgment order that, though entered in a 'qualified immunity' case, determines only a question of 'evidence sufficiency,' *i.e.*, which facts a party may, or may not, be able to prove at trial. This kind of order, we conclude, is not appealable."). Accordingly, we lack interlocutory appellate jurisdiction to review the district court's conclusion that plaintiff may be able to prove as a matter of fact that Pomeroy's use of force was not objectively reasonable. See, e.g., Krein v. Norris, 309 F.3d 487, 493 (8th Cir. 2002) ("[T]o the extent defendants appeal the district court's holding that there remain genuine issues of material fact, and to the extent that they challenge the sufficiency of plaintiff's evidence to support that conclusion, we hold that we lack interlocutory appellate jurisdiction.") (internal footnote omitted); accord Garvin v. Wheeler, 304 F.3d 628, 633-34 (7th Cir. 2002) (in Fourth Amendment case involving a claim of

---

[5]In Anderson v. Cornejo, 355 F.3d 1021, 1022-28 (7th Cir. 2004), the Seventh Circuit held, for example, that the plaintiffs' evidence was relevant to show disparate impact, not disparate treatment, and yet "the equal protection guarantee is concerned only with the latter"; the record "evince[d] nothing more than negligence," and yet the plaintiffs' constitutional claim required proof of deliberate indifference; the plaintiffs attempted to prove vicarious liability, and yet vicarious liability was "not allowed" under the plaintiffs' equal protection theory.

excessive use of deadly force, dismissing the police officer's interlocutory appeal from a denial of qualified immunity as untimely filed, but noting that "there is another reason to decline to exercise jurisdiction. . . . [The district court] correctly observed that this is a factual, not a legal dispute . . . [and Supreme Court precedent] does not allow us to hear disputes on interlocutory appeal regarding which facts the parties might be able to prove at trial.").

Therefore, when the facts are taken in the light most favorable to plaintiff for purposes of the "initial inquiry" under Saucier v. Katz, 533 U.S. at 201, we must assume that the amount of force used by Pomeroy was unreasonable. As a result, we conclude at this threshold stage that plaintiff may be able to prove that Pomeroy violated Parks's Fourth Amendment right. See id. at 201-02 ("[T]here is no doubt that Graham v. Connor, clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness."); Tauke v. Stine, 120 F.3d 1363, 1365-66 (8th Cir. 1997) (applying Fourth Amendment objectively reasonableness standard to use of deadly force).

However, our inquiry does not end there. As stated above, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was *clearly established*." Saucier v. Katz, 533 U.S. at 201 (emphasis added). This inquiry "remains distinct" from the analysis of the excessive force claim. Id. at 204.

> The qualified immunity inquiry . . . has a further dimension. The concern of the [qualified] immunity inquiry is to acknowledge that reasonable mistakes can be made as to the *legal constraints* on particular police conduct. It is sometimes difficult for an officer to determine how the relevant *legal doctrine*, here excessive force, will apply to the factual situation the officer confronts. As officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the

> officer's mistake as to *what the law requires* is reasonable, however, the officer is entitled to the immunity defense.

Id. at 205 (emphasis added).

In other words, we now ask – not whether plaintiff may be able to establish a constitutional violation – but, rather, whether she may be able to establish a violation of a constitutional right of which the contours were so defined at the time of the shooting that a reasonable officer in Pomeroy's position would have understood that what he was doing violated the law. Anderson v. Creighton, 483 U.S. 635, 640 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."). Stated differently, Pomeroy is entitled to qualified immunity even if he wrongly, but reasonably, believed his actions were lawful.

Pomeroy cites numerous Fourth Amendment excessive force cases for the proposition that he was acting lawfully – *or at least reasonably thought he was* – at the time of the shooting. For example, he cites Nelson v. County of Wright, 162 F.3d 986 (8th Cir. 1998) (Nelson).

In Nelson, a Fourth Amendment excessive force case, we reviewed a grant of qualified immunity which was based upon the conclusion that, even viewing the evidence in the light most favorable to the plaintiff, the defendant-officer's actions were objectively reasonable when he used potentially deadly force to subdue the plaintiff in the plaintiff's own home. In that case, when the officer went to the plaintiff's home, after the plaintiff's mother had called the police, the officer knew that the plaintiff had previously been treated for chemical dependency, he was suicidal and had been acting violently, and he had taken a number of pills. The plaintiff actively resisted the officer's efforts to arrest him without force, which led to a physical struggle in which the plaintiff at one point reached for the officer's gun and subsequently shoved the officer on the floor and into a closet. At one point in the

struggle, the officer hit the plaintiff over the head with his "asp." After being shoved in the closet, the officer fired his gun at the plaintiff and wounded him. The entire encounter between the officer and the plaintiff lasted less than three minutes. See id. at 990-91. Under these circumstances, we held:

> Even when the facts are viewed in the light most favorable to [the plaintiff], it is clear that the physical fight was intense and that there would have been little time for the officer to reflect as the situation quickly escalated. [The plaintiff] now tries to analyze the brief struggle as if the incident were composed of distinct and separate segments. At the time, however, it was uncertain what would happen next. The situation was tense and "rapidly evolving." An "officer's actions are not to be assessed with 20/20 hindsight" when he was faced with the need to make instantaneous decisions.

Id. at 991 (citations omitted).

In light of this and other similar precedents, we cannot say that, at the moment of Parks's fatal shooting, Pomeroy reasonably should have known that what he was doing violated Parks's constitutional rights. In the present case, even if we assume that Pomeroy could see Parks's left hand on the floor at the moment of the shooting, it cannot be disputed that Gottstein's gun was nevertheless just inches from Parks's hand. As in Nelson, the physical struggle between Parks and Gottstein was hostile and intense, the circumstances were extremely volatile and potentially deadly, and the events were evolving rapidly. Therefore, notwithstanding plaintiff's citation of arguably contrary Fourth Amendment cases, we hold, upon *de novo* review, that – given the state of the law at the time and the particular facts of this case – Pomeroy did not violate a *clearly established* constitutional right. "Qualified immunity operates in this case . . . just as it does in others, to protect officers from the sometimes 'hazy border between excessive and acceptable force' and to ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful." Saucier v. Katz, 533 U.S. at 206 (internal citation omitted).

The order of the district court denying Pomeroy qualified immunity is therefore reversed, and the case is remanded to the district court for further proceedings consistent with this opinion.

COLLOTON, Circuit Judge, concurring in the judgment.

I agree that the district court's decision denying Officer Pomeroy's motion for summary judgment should be reversed, but I respectfully disagree with the court's discussion of our jurisdiction over this appeal. Therefore, I concur only in the judgment.

Our marching orders for considering an appeal involving an assertion of qualified immunity come from the Supreme Court's decision in *Saucier v. Katz*, 533 U.S. 194 (2001). The Court instructed that the "initial inquiry" must be whether, "[t]aken in the light most favorable to the party asserting the injury, the facts alleged show the officer's conduct violated a constitutional right." *Id.* at 201. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.* However, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.* The court today declines to undertake what the Supreme Court said "must be the initial inquiry" (and instead assumes that Pomeroy's use of force was unreasonable), because it says we lack jurisdiction to decide whether the facts taken in the light most favorable to Parks show that Pomeroy's conduct was objectively unreasonable. *Ante*, at 10-11. I disagree.

To be sure, *Johnson v. Jones*, 515 U.S. 304 (1995), established limits on jurisdiction over immediate appeals by government officials asserting a qualified immunity defense in a "constitutional tort" action. When a district court's order

determines only "which facts a party may, or may not, be able to prove at trial," *id.* at 313, there is no "final decision" within the meaning of 28 U.S.C. § 1291, and the order is not appealable. Thus, if Pomeroy had sought to appeal "whether the evidence could support a finding that particular conduct occurred," *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996) – such as whether Mr. Parks placed his hand on the floor rather than on Officer Gottstein's gun at the time of the shooting, or whether Pomeroy shot Mr. Parks in the back of the shoulder rather than in the chest – then we would lack jurisdiction. *See, e.g.*, *Garvin v. Wheeler*, 304 F.3d 628, 634 (7th Cir. 2002) (no appellate jurisdiction in police shooting case where issues regarding police officer's credibility made it possible that jury could disbelieve officer's testimony that suspect drew gun and credit plaintiff's version that suspect was neither armed nor resisting).

But Pomeroy did not appeal those fact-related determinations. His appeal assumes that all of the facts alleged by Parks are true, but asserts that the facts alleged do not show that the officer's conduct violated a constitutional right. The constitutional right involved is the Fourth Amendment's guarantee against unreasonable seizures, *Graham v. Connor*, 490 U.S. 386, 395-97 (1989), and Pomeroy's appeal asks us to determine whether the facts alleged, taken in the light most favorable to Parks, show that Pomeroy's use of force was "objectively unreasonable." *Id.* at 397. This is precisely the sort of question that the Supreme Court in *Saucier* said "must be the initial inquiry" for a court of appeals, 533 U.S. at 201, and I believe it presents an issue of law. *Hill v. McKinley*, 311 F.3d 899, 902 (8th Cir. 2002); *White v. Balderama*, 153 F.3d 237, 241 (5th Cir. 1998). It is the very question that we answered in *McCoy v. City of Monticello*, 342 F.3d 842, 848-49 (8th Cir. 2003), and I conclude it is a matter that we have jurisdiction to decide. *Accord Billington v. Smith*, 292 F.3d 1177, 1183-85, 1191 (9th Cir. 2002); *see also Lockridge v. Board of Trustees*, 315 F.3d 1005, 1009-12 (8th Cir. 2003) (en banc) (employment discrimination); *Anderson v. Cornejo*, 355 F.3d 1021, 1023 (7th Cir. 2004) ("[I]t is possible, consistent with *Johnson*, to cover the question whether the plaintiffs have a good legal theory as well as the immunity defense; but, as *Johnson* and *Saucier*

hold, this must be done by taking the evidence and reasonable inferences in plaintiffs' favor.") (citation omitted).

For essentially the reasons discussed by the court in its immunity analysis, *ante*, at 13, I conclude that the evidence, taken in the light most favorable to Mr. Parks, does not establish that this tragic situation involved a violation of the Fourth Amendment. Even assuming that Pomeroy could see Parks's left hand on the floor at the moment of the shooting, the undisputed facts remain that Pomeroy heard Officer Gottstein yell that he thought Parks was reaching for Gottstein's gun earlier in the encounter, the gun remained within reach of Parks during the ongoing struggle with Gottstein, and Parks refused to acquiesce in commands that he cease what the court rightly describes as a "hostile and intense" struggle. Given these "extremely volatile and potentially deadly" circumstances, *ante,* at 13, the evidence taken in the light most favorable to Parks does not support a conclusion that Pomeroy's use of force was objectively unreasonable. Accordingly, I concur in the judgment.

______________________________

A TRUE COPY OF THE ORIGINAL
MICHAEL E. GANS, CLERK
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT
BY: Michael E. Gans

**UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**
THOMAS F. EAGLETON COURT HOUSE
ROOM 24.329
111 S. 10TH STREET
ST. LOUIS, MISSOURI 63102

MICHAEL E. GANS
Clerk of Court

VOICE (314) 244-2400
FAX (314) 244-2780
www.ca8.uscourts.gov

December 27, 2004

RECEIVED
BY U.S. MAIL
2004 DEC 29 AM 9:10
CLERK, U.S. DIST COURT
MINNEAPOLIS, MN

Mr. Richard Sletten
Clerk
U.S. DISTRICT COURT, MINNESOTA
202 U.S. Courthouse
300 S. Fourth Street
Minneapolis, MN 55415

Re: 03-2043 Tamara Jean Parks vs. Michael Pomeroy

Dear Clerk:

The mandate of this Court is being sent to the clerk of the district court, together with a receipt. The clerk of the district court is requested to sign, date, and return the receipt to this office.

Any district court records in this court's possession will be returned shortly.

(5175-010199)

Sincerely,

Michael E. Gans

Michael E. Gans
Clerk of Court

paw

Enclosure

(LETTER FOR INFORMATIONAL PURPOSES ONLY)

---

cc: Honorable Michael J. Davis
Robert Bennett
Eric Hageman
Joseph E. Flynn
Pierre N. Regnier

District Court/Agency Case Number(s): CIV 00-2191 MJD/SRN